**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

SEP 2 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| v. | :   **Criminal No.:** $05\text{-}286$ |
| | : |
| **STANLEY KREJCI,** | : |
| | : |
| **Defendant.** | : |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, defendant STANLEY KREJCI and the United States agree and stipulate as follows:

From on or about January of 1996, through at least May of 2000, I worked as the President and Chief Operating Officer of The Interface Group ("Interface," or "the Company"),[1] a small (five to seven employees) executive search firm located in Washington, DC. Mr. William Marumoto founded and owned Interface in the 1970's, whose long-standing employees included Ms. S. Hope Johnson Englander and Ms. Helen Ruggiero. Mr. Marumoto – whom I had met previously when he placed me with one of my prior employers -- personally interviewed me, negotiated the terms of my employment, and hired me. Some time later, I invested $30,000 ~~for~~ to acquire a 42% ownership interest in the Company.

As part of my responsibilities, I formally assumed the position as the sole administrator, Trustee, and fiduciary for Interface's bifurcated pension plan ("Plan"), comprised of a Profit Sharing Plan ("PSP") and a Money Purchase Plan ("MPP"),[2] in April of 1996. The plan's two parts operated similarly. The MPP provided for deferred benefits to plan participants based upon employer contributions, forfeitures, and earnings in plan investments. Benefits were distributed

---

[1]   The Interface Group also called itself "The Interface Group/Boyden," and for a time "Boyden," based on its later affiliation with a national chain of search firms. When that affiliation came to an end, "The Interface Group" name was readopted. The Interface Group has since gone into Bankruptcy, but the underlying business is still a going concern under a reorganization with a different name.

[2]   In 1996, I moved the Plan's assets from accounts managed by Charles Schwab to an account managed by Merrill Lynch, and the assets were merged. Nevertheless, checks written on the Merrill Lynch account continued to bear the label of either the MPP or PSP.

to participants or beneficiaries at retirement, death, disability or termination from employment. The PSP provided for deferred benefits to plan participants based upon employee and employer contributions, employer matching contributions, profit sharing contributions, forfeitures, and earnings in plan investments. Again, benefits were distributed to participants or beneficiaries at retirement, death, disability or termination from employment.

By virtue of my experience and training, I should have known that the Plan was subject to Title I of the Employee Retirement Income Security Act of 1974 (ERISA, 29 U.S.C. §§1001 et seq.). I therefore also should have understood, in principle, that ERISA required me to discharge my duties with respect to the pension plan solely in the interest of the participants and beneficiaries. This would include providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. I also understood, in principle, that I was obligated to act with the skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in serving as a similar trustee.

The plan had several participants, including Mr. Marumoto, Ms. Englander and Ms. Ruggiero. All had worked at Interface for many years prior. Ms. Englander served as an executive search consultant, and Ms. Ruggiero as an office administrator. Each qualified for and participated in the Plan. Ms. Englander and Ms. Ruggiero lost significant sums of money as a result of the conduct described below.

As of July 1, 1996, the age at which Plan participants could take disbursements without penalty was sixty-one. This change was pursuant to an amendment of the original plan documents, adopted on the recommendations of outside company counsel and accountants, to reduce the disbursement age requirement from sixty-five. In my capacity as Trustee, I oversaw the amendment's drafting by outside counsel. Of the Plan's participants, at the time only Mr. Marumoto was eligible to retire and withdraw funds without penalty.

During my tenure at Interface, the firm experienced varying degrees of financial

2

instability, incurring costs, liabilities, and expenses that exceeded Company revenues and assets. These financial challenges threatened Interface's continuing viability, and I struggled to keep the Company solvent. I began to fund Firm operations with Mr. Marumoto's Plan monies, albeit with his knowledge and authorization and which the Plan rules permitted him, in view of his age, to take without penalty. During the course of this conduct, more than $700,000 of Mr. Marumoto's funds were used to maintain the Interface as a going concern, although I did not inform him of when others' retirement funds began to be expended in this fashion.

Although I had access to Plan account statements and other financial information related to the Company's operations -- including periodic reports from a third-party Plan administrator -- I did not monitor the use of Mr. Marumoto's funds as ERISA requires. In addition, I also did not track Plan account balances so as to know: how much money each Plan participant had in the fund prior to writing checks from those accounts; when said withdrawals had exhausted Plan monies belonging to Mr. Marumoto; and consequently, when, commencing in the fall of 1999, Ms. Englander's and Ms. Ruggiero's -- and not only Mr. Marumoto's -- monies were being drawn upon to maintain the company's operations. I understand that Ms. Englander's and Ms. Ruggiero's combined Plan holdings totaled more than $100,000. Nevertheless, this use of Plan funds nearly emptied its accounts.

I executed the following checks, among others, using the proceeds as described above:

| DATE | PAYEE | CHECK NO./ACCOUNT | AMOUNT |
|------|-------|-------------------|--------|
| 7/19/96 | Interface Group | 4310078/Charles Schwab | $75,000 |
| 10/17/96 | Interface Group | 101/Merrill Lynch MPP | $50,000 |
| 11/7/96 | Interface Group | 102/Merrill Lynch MPP | $30,000 |
| 2/27/97 | Interface Group | 103/Merrill Lynch MPP | $50,000 |
| 3/31/97 | Interface Group | 101/Merrill Lynch PSP | $25,000 |

3

| | | | |
|---|---|---|---|
| 4/14/97 | Interface Group | 102/Merrill Lynch PSP | $25,000 |
| 4/30/97 | Interface Group | 103/Merrill Lynch PSP | $25,000 |
| 5/12/97 | Interface Group | 104/Merrill Lynch PSP | $40,000 |
| 5/29/97 | Interface Group | 105/Merrill Lynch PSP | $30,000 |
| 6/27/97 | Interface Group | 106/Merrill Lynch PSP | $80,000 |
| 7/1/97 | Marumoto | 104/Merrill Lynch MPP | $45,000 |
| 9/23/97 | Interface Group | 107/Merrill Lynch PSP | $50,000 |
| 10/30/97 | Interface Group | 108/Merrill Lynch PSP | $30,000 |
| 1/15/98 | IRS | 105/Merrill Lynch MPP | $65,000 |
| 1/15/98 | VA Dept. of Tax. | 109/Merrill Lynch PSP | $16,250 |
| 3/16/98 | Interface Group | 106/Merrill Lynch MPP | $12,000 |
| 3/24/98 | Marumoto | 107/Merrill Lynch MPP | $10,000 |
| 4/13/98 | Marumoto | 110/Merrill Lynch PSP | $40,000 |
| 4/13/98 | Marumoto | 108/Merrill Lynch MPP | $41,971 |
| 5/6/98 | Marumoto | 109/Merrill Lynch MPP | $ 5,000 |
| 9/30/99 | Interface Group | 111/Merrill Lynch PSP | $20,000 |
| 9/30/99 | Interface Group | 111/Merrill Lynch MPP | $25,000[3] |
| 10/14/99 | Boyden | 112/Merrill Lynch PSP | $15,000 |
| 11/5/99 | Interface Group | 113/Merrill Lynch PSP | $10,000 |
| 11/5/99 | Interface Group | 112/Merrill Lynch MPP | $10,000 |
| 12/3/99 | Boyden | 113/Merrill Lynch MPP | $ 5,000 |
| 12/3/99 | Boyden | 114/Merrill Lynch PSP | $ 5,000 |
| 2/16/00 | Interface Group | 115/Merrill Lynch PSP | $10,000 |

---

[3]     This September 30, 1999, check is the first instance in which Plan  funds, other than those belonging to and authorized by Mr. Marumoto, and permissible under the Plan, were taken.

4

| 2/16/00 | Interface Group | 114/Merrill Lynch MPP | $10,000 |
| 5/31/00 | Boyden | 115/Merrill Lynch MPP | $20,000 |

I signed the last check identified above after I had resigned from the company and upon the request of Mr. Marumoto. On that day, I was in the office to help address transition issues when Mr. Marumoto said that they had not yet replaced me as the signatory on the retirement plan account. A company accountant was present when he asked me to do so. Subsequent to my departure, I remitted or caused to be remitted approximately $20,500 in search commissions to the company. Consistent with my intent, I waived my 50% interest in the funds and recommended that these funds be deposited in the pension plan account in order to replenish the funds as previously discussed by Mr. Marumoto and myself. It was my impression that the accountant agreed to this plan. To the best of my knowledge these deposits were not made.

As a result of the conduct described above, I converted $100,539.87 belonging to Ms. Englander and Ms. Ruggiero for the use of the Company. Neither woman authorized the use of their Plan funds. In any event, I should have known that ERISA dictated that I hold, protect, and use such funds solely in a fashion consistent with the Plan's authorizing documents and the legitimate retirement purposes defined by ERISA.

Respectfully submitted,

9/28/05
Date

Stanley Krejci
Defendant

9/28/05
Date

A. John Pappalardo, Esq.
Attorney for the Defendant

5