UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No.: 05-286 (EGS) |
| : | |
| STANLEY KREJCI, : | |
| : | |
| Defendant. : | |

## MOTION AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANT STANLEY KREJCI REGARDING CALCULATION OF LOSS

Pursuant to Local Rule 47, LCrR 47, defendant STANLEY KREJCI, in connection with his forthcoming sentencing, respectfully moves this Court to make the following findings regarding the amount of loss attributable to his offense conduct. As set forth below, Defendant respectfully submits that the appropriate loss amount for purposes of sentencing is $60,039.87, a figure which credits the sum value of the commissions which Defendant assigned to the subject retirement account *prior* to discovery of the offense, and which appropriately excludes funds withdrawn as loans from said retirement account *after* Defendant's resignation.

## BACKGROUND

Defendant was employed as the President and Chief Operating Officer of The Interface Group ("Interface," or the "Company"), a small (five-to-seven employees) executive search firm in Washington, DC, from the beginning of 1996 through the spring of 2000. Mr. William Marumoto founded and owned Interface in the 1970's. Mr. Marumoto personally interviewed Defendant, negotiated the terms of his employment, and hired him.

Prior to, during and after Defendant's association with the Company, Interface had in place a bifurcated pension plan (the "Plan"), comprised of a Profit Sharing Plan ("PSP") and a

Money Purchase Plan ("MPP"). The Plan's two parts operated similarly, with benefits distributed to participants or beneficiaries at retirement, death, disability or termination from employment. The Plan had several participants, including Mr. Marumoto, Ms. S. Hope Johnson Englander and Ms. Helen Ruggiero. All had worked at Interface for many years prior. Ms. Englander served as an executive search consultant, and Ms. Ruggiero as an office administrator. Each qualified for and participated in the Plan.

As part of his responsibilities, Defendant, as of April 1996 assumed the role of sole administrator, Trustee, and fiduciary for the Plan, taking over from Mr. Marumoto. The Plan was audited annually, and each audit Defendant received during his tenure at the Company was clean. As of July 1, 1996, the age at which Plan participants could take disbursements without penalty was sixty-one. This constituted a change pursuant to an amendment to the original Plan documents, adopted on the recommendation of outside corporate counsel and accountants, to lower the withdrawal age from sixty-five. In his capacity as Trustee of the Plan, Defendant oversaw the drafting of this amendment by outside counsel. Of the Plan's participants, at all relevant times, only Mr. Marumoto was eligible to retire and withdraw funds without penalty.

During Defendant's tenure at Interface, the firm experienced varying degrees of financial instability, incurring costs, liabilities, and expenses that exceeded Company revenues and assets. These financial challenges threatened Interface's continuing viability, and Defendant and Mr. Marumoto struggled to keep the Company solvent. Mr. Marumoto, founder of the Company and its majority owner, began to fund Interface's operations with his own Plan monies, which the Plan rules permitted Mr. Marumoto, in view of his age, to take without penalty. As the Plan administrator, Defendant was called upon by Mr. Marumoto to execute the withdrawals from the

Plan account. In this manner, Mr. Marumoto, with Defendant's assistance, utilized more than $700,000 of his funds to maintain the company he had founded as a going concern.

As of 1999, all such withdrawals from the Plan, by agreement of Mr. Marumoto and Defendant, were to be treated as loans, and subject to repayment by the Company, with interest. A memorandum of understanding signed by Mr. Marumoto and Defendant, dated December 23, 1999, memorialized this agreement.

Although Defendant had access to Plan account statements and other financial information related to the Company's operations, he failed to accurately track Plan balances, and thus failed to recognize when Mr. Marumoto had exhausted his own funds, and when the withdrawals began to draw loans on the funds of the other two Plan participants. Consequently, in the fall of 1999, Ms. Englander's and Ms. Ruggiero's – not only Mr. Marumoto's – monies were being drawn upon as loans to maintain the Company's operations.

Defendant executed the following checks, among others, using the proceeds as described above:

| DATE | PAYEE | CHECK NO./ACCOUNT | AMOUNT |
| --- | --- | --- | --- |
| 7/19/96 | Interface Group | 4310078/Charles Schwab | $75,000 |
| 10/17/96 | Interface Group | 101/Merrill Lynch MPP | $50,000 |
| 11/7/96 | Interface Group | 102/Merrill Lynch MPP | $30,000 |
| 2/27/97 | Interface Group | 103/Merrill Lynch MPP | $50,000 |
| 3/31/97 | Interface Group | 101/Merrill Lynch PSP | $25,000 |
| 4/14/97 | Interface Group | 102/Merrill Lynch PSP | $25,000 |
| 4/30/97 | Interface Group | 103/Merrill Lynch PSP | $25,000 |

| Date | Payee | Check No./Account | Amount |
|---|---|---|---|
| 5/12/97 | Interface Group | 104/Merrill Lynch PSP | $40,000 |
| 5/29/97 | Interface Group | 105/Merrill Lynch PSP | $30,000 |
| 6/27/97 | Interface Group | 106/Merrill Lynch PSP | $80,000 |
| 7/1/97 | Marumoto | 104/Merrill Lynch MPP | $45,000 |
| 9/23/97 | Interface Group | 107/Merrill Lynch PSP | $50,000 |
| 10/30/97 | Interface Group | 108/Merrill Lynch PSP | $30,000 |
| 1/15/98 | IRS | 105/Merrill Lynch MPP | $65,000 |
| 1/15/98 | VA Dept. of Tax. | 109/Merrill Lynch PSP | $16,250 |
| 3/16/98 | Interface Group | 106/Merrill Lynch MPP | $12,000 |
| 3/24/98 | Marumoto | 107/Merrill Lynch MPP | $10,000 |
| 4/13/98 | Marumoto | 110/Merrill Lynch PSP | $40,000 |
| 4/13/98 | Marumoto | 108/Merrill Lynch MPP | $41,971 |
| 5/6/98 | Marumoto | 109/Merrill Lynch MPP | $ 5,000 |
| 9/30/99 | Interface Group | 111/Merrill Lynch PSP | $20,000 |
| 9/30/99 | Interface Group | 111/Merrill Lynch MPP | $25,000[1] |
| 10/14/99 | Boyden | 112/Merrill Lynch PSP | $15,000 |
| 11/5/99 | Interface Group | 113/Merrill Lynch PSP | $10,000 |
| 11/5/99 | Interface Group | 112/Merrill Lynch MPP | $10,000 |
| 12/3/99 | Boyden | 113/Merrill Lynch MPP | $ 5,000 |
| 12/3/99 | Boyden | 114/Merrill Lynch PSP | $ 5,000 |
| 2/16/00 | Interface Group | 115/Merrill Lynch PSP | $10,000 |

---

[1] This September 30, 1999 check is the first instance in which Plan funds, other than those belonging to and authorized by Mr. Marumoto, and permissible under the Plan, were utilized.

4

| 2/16/00 | Interface Group | 114/Merrill Lynch MPP | $10,000 |
| 5/31/00 | Boyden | 115/Merrill Lynch MPP | $20,000 |

Defendant signed the last check identified above *after* he had resigned from the Company and at the urging of Mr. Marumoto. Defendant had been in the office that day to assist in addressing transition issues when Mr. Marumoto informed him that they had not yet replaced Defendant as the signatory on the Plan account. A Company accountant, Ms. Carrie Duggan of Soza and Company, was present when Mr. Marumoto directed Defendant to do so. A memorandum to file, signed by both Defendant and Mr. Marumoto, was generated reflecting that the sum was a loan to the Company, requested by Mr. Marumoto, and in an amount determined by Ms. Duggan. A copy of the referenced memorandum is attached hereto at Tab A.

In November 2000, months after his departure, Defendant remitted or caused to be remitted approximately $20,500 in search commissions to the Company. A copy of Defendant's letter to Mr. Marumoto and the accompanying check are attached hereto at Tab B. Consistent with his intent, Defendant waived his 50% interest in the funds and recommended that these funds be deposited in the Plan account in order to replenish the Plan's funds, as previously had been discussed by Mr. Marumoto and Defendant. To the best of Defendant's knowledge, however, these deposits were not made into the Plan account.

As a result of the conduct described above, the government contends that Defendant converted $100,539.87 belonging to Ms. Englander and Ms. Ruggiero for the use of the Company, and that this is the loss figure which should be employed at sentencing. For the reasons set forth below, however, the appropriate loss figure for purposes of sentencing is $60,039.87.

# ARGUMENT

## I. The Loss for Purposes of Sentencing Should Be Reduced by the $20,500 in Assigned Commissions.

Defendant sought to remedy in part the losses to the Plan through his directive to Mr. Marumoto to assign to the Plan commissions due totaling approximately $20,500, and in which he held a 50% interest. Upon receiving a check in payment for one of these commissions in November 2000, Defendant forwarded it to Mr. Marumoto precisely for this purpose. Notably, Defendant's assignment of his interests in these sums preceded the discovery of the offense by almost a year.[2] Accordingly, the value of the total $20,500 in commissions should be excluded from the loss calculation. See U.S.S.G. § 2B1.1, Application Note 2(E)(i) ("Credits Against Loss. -- Loss shall be reduced by . . . [t]he money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.").

Whether or not Mr. Marumoto actually deposited the forwarded funds into the Plan account as Defendant intended and understood they would be is not of consequence for purposes of this analysis, for what is relevant is Defendant's intent:

> Intended loss is meant to be a measure of a defendant's culpability. U.S.S.G. § 2B1.1 comment. (background); United States v. McBride, 362 F.3d 360, 375 (6th Cir. 2004). With this in mind, courts do not subtract from the intended loss repayments made by a defendant to his victim after the detection of the offense, as such payments, given their timing, likely do not indicate anything about the defendant's culpability. United States v. Swanson, 360 F.3d 1155, 1168-69 (10th Cir.2004); see U.S.S.G. § 2B1.1 comment. (n.2(E)(i)). For the opposite reason, though, courts do subtract payments that were made before the offense was discovered. See U.S.S.G. § 2B1.1 comment. (n.2(E)(i)).

---

[2] Defendant was not made aware of any investigation until he was contacted almost a year later by an investigator from the Department of Labor in October, 2001.

6

United States v. Staples, 410 F.3d 481, 491 (8th Cir. 2005). Here, the timing of Defendant's assignment of the commissions speaks clearly as to his intent and culpability, and the loss for purposes of sentencing should be reduced by the $20,500 in assigned commissions.

## II. Sums Withdrawn from the Plan at Mr. Marumoto's Direction Following Defendant's Resignation from the Company Should Not Be Included in the Loss Calculation for Purposes of Sentencing.

The $20,000 withdrawn on May 31, 2000, after Defendant had resigned from his position at the Company, should not be included in the loss calculation attributable to his offense conduct. The reasons for this are two-fold. First, upon his resignation from Interface, Defendant ceased to serve as the administrator of the Company's Plan. Indeed, on the subject date, Defendant no longer held a position of employment with the Company, and was present at the offices only to assist in administrative matters associated with the transition of his former responsibilities. It was in this context that Mr. Marumoto informed Defendant that he had not yet designated a successor signatory on the Plan's accounts, and implored him to perform the seemingly innocent, ministerial task of signing off on a check for a loan drawn from the Plan.

Second, Defendant acted on the request of Mr. Marumoto in good faith, without any direct or indirect benefit to himself, signing off on the check to accommodate what he reasonably believed was an administrative oversight by his former employer. At the time, of course, Defendant had no independent access to information concerning the Plan or its then current level of funding other than that of which Mr. Marumoto informed him. What is more, the Company's outside accountant, Ms. Duggan, was present when Mr. Marumoto urged Defendant to provide his signature, and had her self stated the specific amount to be drawn, providing further basis for Defendant to reasonably view acceding to the request as an unproblematic accommodation.

Faced with Mr. Marumoto imploring him for his assistance in what appeared to be an innocuous matter of significant importance to the cash-starved Company, Defendant did as he was asked.

In sum, and in marked contrast to those transactions which occurred while Defendant was the Plan administrator and had access to information as to its funding levels and allocation among participants, the $20,000 attributable to this May 31, 2000 transaction does not reflect Defendant's intent or culpability. Accordingly, because its inclusion would be inappropriate and distorting, the $20,000 should be excluded from the total loss for purposes of sentencing.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant respectfully requests the Court find the loss attributable to the offense for purposes of sentencing to be $60,039.87.

Dated this 1st day of December 2005.

>                   Respectfully Submitted,
>
>                   GREENBERG TRAURIG LLP
>                   800 Connecticut Ave., N.W.
>                   Suite 500
>                   Washington, D.C. 20006
>                   Tel. (202) 331-3100
>                   Fax (202) 331-3101
>
>                   _____
>                   Sanford M. Saunders, Jr.
>                   D.C. Bar No. 376098
>
>                   Counsel for Defendant, Stanley Krejci

# TAB A

## MEMORANDUM FOR THE RECORD

On this date, 31 May 2000, at 4:30 PM, Mo asked that I draw a check on the Money Market Account to fund the operations of the company with the company establishing a 5 year payback program for the borrowed funds.

A check, Number 115, for $20,000, the amount determined by Carrie Duggan of Soza and Company, was drawn on the appropriate account, copy attached.

The check was given to Helen Ruggiero to deposit in the bank.

An appropriate entry was made on the financial statement indicating that the amount of the check was a loan to the company.

_____
Stanley L. Krejci

_____
William H. Marumoto

| STANLEY KREJCI
INTERFACE GROUP
MONEY PURCHASE PLAN
2828 PENNSYLVANIA AVE NW SUITE 305
WASHINGTON, DC 20007 | RCMA for Business Retirement Plans | 115 |

PAY TO THE ORDER OF ___Brydon___  $ 20,000.00

___twenty-thousand___ 00/100 DOLLARS

Merrill Lynch

BANK ONE, BANK ONE, COLUMBUS, NA
Columbus, Ohio 43271

MEMO _____       _____

⑆044000804⑆ 041101501501⑈ 0115

# TAB B

6111 Vernon Terrace
Alexandria, VA 22307
29 December 2000

Mr. William H. Marumoto
Chairman
The Interface Group, Ltd.
2445 M Street, N.W.
Suite 250
Washington, D.C. 20037

Dear Mo:

Enclosed is the final check for $6,250 for the retained executive search for the Managing Director of the Hoop Dreams Foundation, which I completed as per our understanding.

Per your letter of 24 May 2000, paragraph three, I should receive 50% of the fee, or $3,125. I would not object to having my half merged with the company's half with the understanding that the total amount be applied, for example, to assist the company in reducing its documented borrowings of funds from the retirement plan/money market plan and that the application of said funds be prorated appropriately to Helen and Hope.

In addition, it is my understanding that in mid-November Unitech paid its final obligation of $14,233 for the search I had conducted. Again, according to your letter cited above, I should receive 50% of that fee, or $7,000. In this case, I also would not object to having my half merged with the company's half to be applied as suggested in the paragraph above.

I am sure that you would agree with the course of action suggested above and will therefore act accordingly.

The payments of these two invoices complete my outstanding executive search projects.

Sincerely,


Stanley L. Krejci

Enc.

9 November 2000

Mr. Patrick H. McGettigan
Chairman
McGettigan Foundation
3327 N Street, N.W.
Washington, D.C. 20007

## INVOICE

For professional services rendered in confidential retained executive search for the
<u>Managing Director for the Hoop Dream Foundation</u>.

**FEE**
Final installment of fee                                              $6250.00

PLEASE REMIT PAYMENT            Boyden
AND ONE COPY
INVOICE TO:

---

Resource Management Account® 349

PATRICK MCGETTIGAN
3327 N. ST. N.W.
WASHINGTON, DC 20007-2808

Date: Nov 17, 2000        25-80/440

Pay to the Order of: Boyden                                    $ 6,250.⁵⁰

Six Thousand, Two Hundred, Fifty and ¹⁰⁰/ₓₓ                    Dollars

**PaineWebber**
Bank One, N.A., Columbus, OH 43271

For: Hoop Dreams Managing Director          [signature] Patrick X. McGettigan

⑆044000804⑆  8304946086⑈  0349

CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2005, a copy of the foregoing DEFENDANT'S MOTION AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES REGARDING CALCULATION OF LOSS was served via first class mail postage prepaid:

    Thomas Edwin Zeno, Esq.
    U.S. ATTORNEY'S OFFICE
    555 Fourth Street, NW
    Washington, DC 20530
    (202) 514-6957
    Fax: (202) 307-2304
    Email: thomas.zeno@usdoj.gov

_____
Kenneth P. Kaplan