## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No.:  05-286 |
| | : | |
| STANLEY KREJCI, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT STANLEY L. KREJCI'S
## SENTENCING MEMORANDUM AND MOTION

Defendant Stanley L. Krejci ("Mr. Krejci"), by and through counsel, respectfully submits this sentencing memorandum and motion (the "Memorandum") in connection with his sentencing by the Court on February 23, 2006.  On September 28, 2005, Mr. Krejci plead guilty before Your Honor to an Information charging him with one count of violating 18 U.S.C. § 664, which criminalizes the conversion of employee benefit plan assets.  Mr. Krejci accepts full responsibility for his actions, and through this memorandum seeks to provide the Court with information pertinent to his sentencing and, pursuant to the advisory United States Sentencing Guidelines (the "Guidelines") and the sentencing factors and goals of 18 U.S.C. § 3553(a), respectfully moves for a sentence of supervised probation.

### INTRODUCTION

The Court is asked to weigh a lone, aberrant and deeply regretted offense against a law-abiding lifetime of integrity, professionalism and genuine charity.  The incarceration of Mr. Krejci for this offense would serve no end but that of unnecessary hardship on the many people who love and rely upon him.  Clearly, Mr. Krejci's conduct was a tragic error in judgment, constituting, as is demonstrated below and in the letters submitted by his friends and colleagues,

a marked deviation from the otherwise commendable and lawful course of his life. Mr. Krejci did not commit the offense for a selfish reason, such as filling his own pockets. He made no personal use of any of the money from the subject employee benefit plans (hereinafter, the "Plan" or "Plans"). On the contrary, Mr. Krejci's conduct was directed entirely to preventing the collapse of The Interface Group (the "Company"): at the request of the Company's founder and principal, Mr. Krejci caused the Plan to loan money to the Company. In doing so, Mr. Krejci embarked on what was an initially lawful course, approved by Company's independent, outside Plan advisors and accountants. It was only when these loans to the Company reached into the funds of Plan participants who had not provided their express approval of such use that, as Mr. Krejci sought to avoid what he perceived as the greater harm, the hitherto lawful conduct abruptly became criminal. Further, Mr. Krejci has since made complete restitution. In terms of "loss," moreover, Mr. Krejci cannot fairly be charged with the conversion of Plan assets he returned *prior* to discovery of the offense or funds withdrawn *after* he had left the Company. Thus, rather than the "loss" of $100,539.87 as the Presentence Report ("PSR") contends, the loss for purposes of sentencing should be no more than $60,039.87.

The heartfelt letters written on Mr. Krejci's behalf by family members, friends, colleagues, neighbors, associates and others eloquently depict a man of the utmost integrity, dedicated to community and tirelessly devoted to improving the lives of his fellow man. For more than three decades, Mr. Krejci's extraordinary and wide ranging voluntary contributions to and leadership in charitable, educational, social service and business organizations have made him one of the most well-known, well-respected and well-liked men in Alexandria. The testimony of those who know him best further tells of how, amid a lifetime of law-abiding conduct and immeasurable good works, Mr. Krejci's aberrant offense has brought him a

profound sense of remorse and contrition. Mr. Krejci's imprisonment would be coldly disproportionate to the offense in view of its nature and the circumstances in which it occurred, and in light of Mr. Krejci's history and character.

For the reasons set forth below, Mr. Krejci respectfully submits that, pursuant to the advisory Guidelines and the sentencing goals of 18 U.S.C. § 3553(a), a sentence of probation is sufficient, but no greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

**BACKGROUND**

The PSR's overview of Mr. Krejci's personal and professional history and the offense conduct will not be repeated. Instead, a more full and complete view of Mr. Krejci, who has led a life of giving of himself to family, friends, community and country, is depicted in the accompanying more than 100 letters to the Court. This Memorandum cannot substitute for the words of those who know Mr. Krejci best, but instead will note and summarize certain statements and circumstances which place both the man and his offense into context, and underscore why a term of imprisonment should not be imposed.

A.    **Mr. Krejci's Relevant History**

*Family, Education, and Military Service*

Mr. Krejci is 63 years old and has been married to his wife Gail for 35 years. He has two grown children. His daughter Stacey, 32, is employed as a management consultant in Washington, D.C. His son Andrew is 29 and is employed in an advertising firm in Denver.

In 1964, Mr. Krejci graduated from Northwestern University with a bachelor of arts degree. After graduation, Mr. Krejci joined the U.S. Navy through the University's NROTC Program. He served for nine years, during which he rose to the rank of Lieutenant Commander-

Supply Corps, and was honorably discharged in 1973.  Mr. Krejci received a masters in business administration degree in 1971 from the George Washington University through the U.S. Navy's postgraduate program.

The words of his superiors in the Navy show that Mr. Krejci's integrity and self-sacrifice are life-long traits.  William Armistead, one of Mr. Krejci's former commanding officers, has remained a close friend for over thirty years.  "Stan is one of the kindest and most unselfish human beings I have ever known," he writes.[1]  He describes Mr. Krejci as "dedicated, generous, gentle and God-fearing."  (W. Armistead)  Retired U.S. Naval Captain Alan Barnes, who worked closely with Mr. Krejci on tour during the Viet Nam war, observed that Mr. Krejci "displayed a high standard of conduct and showed outstanding personal attributes and courage during a time of significant turmoil in South Viet Nam."  (A. Barnes)

*Professional Career*

Following his honorable discharge, Mr. Krejci served in finance and in executive positions.  In 1988, Mr. Krejci went to work at Landmark Systems, a software development company, where he held the positions of vice president of finance, chief financial officer, treasurer and assistant secretary over a tenure of nearly eight years.  Thereafter, in 1996, Mr. Krejci joined The Interface Group ("Interface," or the "Company"), a small (five-to-seven employees) executive search firm in Washington, D.C.  Mr. William Marumoto, who personally interviewed Mr. Krejci, negotiated the terms of his employment and hired him, founded and owned Interface in the 1970's.  Mr. Krejci left Interface in 2000, and has since been employed in executive recruitment at The McCormick Group, Inc. ("McCormick"), of Arlington, Virginia.

---

[1]    The letters written on behalf of Mr. Krejci are collected in the Appendix (hereinafter, "App.") submitted with this memorandum, and are organized alphabetically (together with a table to contents) by surname of the writer. The correspondence is cited herein by the first initial and surname of the respective author, in parentheses.

Mr. Krejci's current colleagues at McCormick describe the same energetic, generous, and honorable man that his Navy superiors had served with over three decades ago. As his colleagues explain, when Mr. Krejci arrived at McCormick, business was in a lull due to the collapse of the technology boom. Nevertheless, "Stan had to fight hard to build a base of business but he had a persistence and determination about him that was immediately evident to us all. It took about a year but those qualities paid off, big time. Today he is extremely successful and has had a wonderful impact on our company." (P. Rothenberg) In the executive recruitment business, Mr. Krejci would not have been able to attain these accomplishments without the "key ingredient[s]" of his success -- "trust, respect, sincerity, honesty, reputation, integrity and character." (A. Ashforth)

*Service to Others*

The scores of letters written in support of Mr. Krejci paint a consistent and compelling portrait of a man compassionately devoted to improving the lot of his fellow man. Mr. Krejci's good works and commitment to helping others manifest in all dimensions of his life, from simple acts of kindness to a troubled neighbor all the way to his extraordinary dedication and leadership in numerous charitable, educational, social and business societies in the Washington, D.C. metropolitan area.

While the PSR (¶ 53) lists various civic organizations in which Mr. Krejci has been active, the significance of Mr. Krejci's participation in them cannot be overstated. As a threshold matter, Mr. Krejci's charitable efforts are not a recent phenomenon, but rather a lifelong practice. Mr. Krejci's involvement in myriad benevolent organizations over the years is "legendary" (C. Demery; S. Keith), and his contributions "immeasurable" (J. Close, M.D.), making him the "Most Valuable Player" of the City of Alexandria. (T. Brown) According to his

neighbor and friend of 15 years Marvin Bush, Mr. Krejci is one the "most significant contributors to our Alexandria community … driven by his thoughtful and selfless personality as well as by his natural inclination to make his community stronger in every way." (M. Bush)  As another friend observes, "If someone in the city has a just cause such as the Campagna Center, the Alexandria Symphony, Northern Virginia Community College, Goodwin House, etc., his/her first thought is, 'Let's get Stan Krejci to be in charge or at least be an integral part of it.'" (J. Close, M.D)  Few, if any, in the D.C. Metropolitan area have "provided so much leadership and time to a great range of pro bono activities that enrich the entire community." (J. Knop)  It is "difficult to name another person who has given more of his time and energy to his community." (V. Hawkins)  "Where many of us would shy away from a difficult situation, [Mr. Krejci] steps up and helps." (A. Adair)

The magnitude and extent of Mr. Krejci's civic and charitable contributions documented in the voluminous correspondence defy complete discussion in this Memorandum, and some illustrative examples need suffice.  The Campagna Center, for example, is a non-profit organization that operates several programs for needy and underprivileged children and families in the Alexandria area and Northern Virginia.  The Center runs programs such as Head Start, Early Head Start, and before and after school day care.  The Center provides needed enrichment programs, tutoring and other services essential to the education and development of children who, otherwise, would have no such support.  Mr. Krejci was invited to join the board of directors of The Campagna Center about eight years ago.  As the then chair of the Board of Directors writes, "Stan quickly became one the board's most valuable Directors." (J. Vogel)  A fellow director notes: "The Campagna Center's constituents are not the wealthy and well-known; they are the underserved and unknown.…Stan led and organized numerous events and activities

in Alexandria to build community awareness for the challenges and needs of low-income children and families and to raise funds to contribute to ongoing and new programs to give these children opportunities they otherwise wouldn't have to learn and grow into responsible citizens." (L. Hutter)

The Paul Public Charter School in Washington D.C., dedicated to serving inner city students of color and ethnic minorities, also has been the beneficiary of Mr. Krejci's contributions of his talents and time. Mr. Krejci initially had been engaged by the school as a consultant, yet "so impressed the school's administration with his dedication to the educational process that they asked him to serve on the board... As a governor of the school, he has been deeply and delightedly engaged in all efforts to provide its students ... with rigorous academics, character development, and leadership training." (S. Keith) Most recently, Mr. Krejci has served as the school's Treasurer, volunteering "countless hours promoting the schools goal's and locating avenues for additional resources." (B. Nophlin) "Even in this time of personal tragedy, Mr. Krejci continues to serve the school with the same grace and enthusiasm except that he has moved into the background to avoid opprobrium for the school." (H. Bardonille)

A genuine, sincere desire to help others has driven Mr. Krejci to make these and other contributions to his community over the years. His "extraordinary good works flow from a highly developed sense of altruism and social justice." (S. Keith) His charitable deeds are not self-serving or motivated by self-promotion. As described by a fellow member of the board of Goodwin House, a non-profit continuing care retirement community, Mr. Krejci's "intent has never been self-glorification, but rather genuine interest in making improvements within his community." (C. Smith) His many philanthropic activities have been done "quietly without 'tooting his own horn.'" (M. Casey) Indeed, much of Mr. Krejci's giving is "unseen and

unclaimed" for which he seeks no recognition or credit.  (R. Bartenstein)  One friend of over 20 years notes: "Many of our citizens who don't know Stan and thus cannot write on his behalf have benefited greatly from the funds that he has raised for their needs."  (C. Flemming)  In short, Mr. Krejci's lifetime of beneficence is true to his nature, rather than the product of strategic angling for self-advantage.  Simply stated, Mr. Krejci "genuinely likes people and serving his community.  He takes an interest in everyone, ands his generosity and personal kindnesses … have been widespread."  (V. Voght)  "Stan is a good person who goes out of his way to remember the lost souls and include them in his life."  (K. Appler)

Mr. Krejci's extraordinary personal commitment to helping others is even more remarkable in that it has in no way detracted from his devotion to family.  He is universally described as a deeply caring, loving husband and father, uncle, brother.  As one close friend of 20 years explains: "Stan and Gail have raised two wonderful children, and he was the kind of dad who always rearranged his busy schedule to be in the stands or on the sidelines when his children competed in the several sports in which they excelled.  If parental support was needed for any of these activities, Stan was always there to help."  (T. Sullivan)  His nephew, president and general manager of ABC Radio Washington, calls his uncle "a great family man, hard-working business executive, and selfless civic leader.  As long as I have known him [47 years], he has always put others first.  Stan is a rare individual who never utters an unkind word about anyone and vice-versa."  (J. Boden)

*Impact of Prosecution and Plea*

As many of the letters written on his behalf relate, the investigation and prosecution have been "devastating" to Mr. Krejci.  He is "stunned, sad and remorseful for what has occurred." (R. Klein)  Because of the expected adverse publicity, Mr. Krejci took it upon himself to

relinquish board memberships and other leadership positions with the many volunteer

organizations that have been such a significant part of his life.  He did so to ensure that his

situation did not distract from the missions of these groups.  See, e.g., (W. Dudley).  In doing so,

Mr. Krejci has been nothing but candid and "profoundly remorseful."  (C. Munoz;  H. Ezrin)

Mr. Krejci's contrition for his offense and the pain it has brought him and those around him is

genuine and profound.  His neighbor and close friend of 30 years, Charles O'Connor, general

counsel of Maersk Inc., observes that he has "no doubts that [the Court has] had few defendants

come before you who have more of a sense of shame, remorse and contrition that Stan Krejci."

(C. O'Connor)

The response of Mr. Krejci's community to the news of his prosecution has been one of

disbelief.  The report of his offense was completely inconsistent with his character for integrity,

decency and sense of honor, a person who could always be "counted on to 'do the right thing.'"

(H. Thompson)  Indeed, struggling to reconcile their knowledge of Mr. Krejci and of his offense,

many writers perceive, based on public information, that Mr. Krejci made a terrible mistake, but

one born from an intent to help others.  As one writer notes, "When I look at the crime that Stan

has willingly admitted he committed, and I look at his long history of community service, I see a

man, who, once again, was trying to solve a problem within an organization, not taking money

for his own advantage."  (C. Smith)  Yet another:  "A review of the referenced docket indicates

that Stan made a huge mistake influenced by hard work under the stress of keeping a business

afloat."  (J. McGuiness)  As Mr. O'Connor opines, "[T]he only way I could rationalize the

conduct with the man I knew was to conclude that at the point in time the pension fund assets

were depleted, Stan and his business partner were dealing with a failing enterprise that they

desperately wanted to maintain as a source of employment for themselves and their other

Interface employees, and Stan simply lost focus on his duties as a fiduciary and focused exclusively on attempting to save the business." (C. O'Connor)

As the letters written on behalf of Mr. Krejci make abundantly clear, moreover, his community and the many institutions he has served have experienced deep regret, both for the loss of Mr. Krejci's energetic generosity and for Mr. Krejci's own loss of that to which he had been so dedicated. See e.g., (W. Fry); (H. Ezrin). As his son Andrew writes, "I found myself even more devastated for my father when he told me that he was going to resign from the professional and community organization boards he was currently sitting on. I could not think of a tougher one-two punch for my father to take…. This is a man who has always put others in front of himself and now he is not only being charged with a crime, but he is being forced to resign from organizational boards that he serves on for nothing else but the greater good of his community." (A. Krejci)

Notwithstanding the outpouring of support he has received from the Washington, D.C. metropolitan community, Mr. Krejci has done nothing to minimize the seriousness of his offense or his full and complete responsibility. He has spoken candidly and frankly with friends, neighbors, associates, and fully acknowledged his misconduct. "He has not run from the responsibility." (W. Dudley)

There is an additional point of agreement among those who have written on Mr. Krejci's behalf. As articulated by one writer, Mr. Krejci has "been tried by his own conscience many times over [and] [a]lthough he has done everything in his power to make restitution, he will feel remorse for what has occurred for the rest of his life." (S. Keith) Mr. Krejci "is already serving a sentence--that imposed by his own conscience and the fundamentally unsettling events related to this matter." (C. Munoz) Observing Mr. Krejci's situation, a physician and long-time friend,

Dr. James Close, expresses the concern that one "must also consider the deleterious effect that it would have on both Stan and [his wife] Gail's well-being were he to be incarcerated. Even now, I am able to see the profound effect that the publicity has already had on both of them. Even if nothing else comes from these charges, I fear that they may never recover from what has happened thus far." (J. Close, M.D.)

Finally, Mr. Krejci's community speaks in a strong, respectful voice praying that the Court "show the same generous and caring spirit to Stan now as he has shown to the legions of our most needy citizens for years" (C. Fleming)  Simply put: "Alexandria needs Stan…and Stan needs Alexandria." (D. Wintermute)  The Court should find in the sentencing phase a meaningful opportunity to "harness[] the good and untiring effort that Stan has always shown" in his service to the community, and thereby benefit both. (J. Landers)  The Court should not impose a sentence of incarceration on Mr. Krejci, who "can do more for good on the outside, working in the community, that he could ever do in prison." (T. Sullivan)  "Our family, his friends, and the countless recipients of his generous philanthropy would stand to lose without Stan's continued involvement." (J. Boden)  In contrast with his violation of the law as discussed below, Mr. Krejci's public service is not "aberrant" behavior.

**B.**     **The Events Giving Rise to the Offense Conduct.**

Mr. Krejci will not rehash the facts of this case, which are set forth in the Statement of Offense. The following points, however, are worthy of emphasis.

First, over a period of three years, until mid-September 1999, William Marumoto, Interface's founder and majority owner,[2] caused $700,000 of his own retirement assets in the Plans to be loaned to Interface. As Trustee of the Plans, and by agreement with Mr. Marumoto,

---

[2]     Mr. Krejci had by this time purchased a minority ownership in the Company from Mr. Marumoto for $30,000.

Mr. Krejci signed checks from the Plan accounts to the Company on approximately 21 occasions over this period.  Mr. Krejci believed that these funds were needed to keep Interface in business. *The transfer of such funds over this three-year period  from the Plans to Interface was entirely lawful, having been vetted and blessed by Company counsel.*  Indeed, counsel had been specifically retained at Mr. Krejci's direction to amend and lower the age of permissible withdrawal under the Plans so that Mr. Marumoto's funds could be withdrawn and loaned to the Company without penalty to him.

Second, although Mr. Krejci had access to Plan account statements and other financial information related to the Company's operations, he failed accurately to track Plan balances, and thus failed to recognize when Mr. Marumoto had exhausted his own funds, and when the withdrawals began to draw on the funds of the other two Plan participants.  Consequently, in the fall of 1999, monies of Ms. Englander and Ms. Ruggiero – and not only Mr. Marumoto –  began to be drawn upon as loans to maintain the Company's operations.[3]

Third, Mr. Krejci converted none of the Plan funds for his own use.  In fact, Mr. Krejci, in the face of the cashflow crisis, had by 2000 stopped drawing a salary from the Company altogether.

Fourth, at the urging of Mr. Marumoto, Mr. Krejci signed the last check drawn from the Plan on May 31, 2000 -- *after* he had resigned from the Company and had ceased employment. Mr. Krejci had been in the office that day to assist in addressing transition issues when Mr. Marumoto informed him the Company had not yet replaced Mr. Krejci as the signatory on the Plan account.  A Company accountant, Ms. Carrie Duggan of Soza and Company, was present

---

[3]    After Mr. Krejci's departure, one of the victims authorized Interface to withdraw funds from her interests in the Plan for use by the Company.

when Mr. Marumoto directed Mr. Krejci to do so.[4] A memorandum to file, signed by both Mr.

Krejci and Mr. Marumoto, was generated reflecting that the sum was a loan to the Company,

requested by Mr. Marumoto, and in an amount determined by Ms. Duggan.[5]

Fifth, in November 2000, Mr. Krejci returned approximately $20,500 in search

commissions to the Company, and by accompanying letter advised Mr. Marumoto to put the

money in the Plan. Mr. Krejci waived his 50% interest in the funds.[6] Mr. Krejci did not became

aware of any investigation concerning the Plan until a year later.

### ARGUMENT

I.      **The Loss for Purposes of Sentencing Should Be Reduced by $40,500.**

For the reasons set forth in the previously submitted Motion of Defendant Stanley Krejci

Regarding Calculation of Loss ("Motion Regarding Loss"), the maximum amount of loss

appropriately considered in determining Mr. Krejci's sentence should be $60,039.87, instead of

$100,539.87, as stated in the PSR. As set forth in Mr. Krejci's Motion Regarding Loss, in

calculating the loss, the $100,539.87, which reflects the amount of money taken from the Plans,

should be reduced by (i) the $20,500 Mr. Krejci sent to Mr. Marumoto, to be returned to the

Plans, in November 2000, a year before Mr. Krejci had knowledge of any investigation; and (ii)

the $20,000 in Plan assets Mr. Marumoto ordered conveyed weeks after Mr. Krejci ceased

employment.

The government in its Opposition argues that the $20,5000 Mr. Krejci returned before

discovery of loss should not be excluded from the calculation of loss under U.S.S.G. § 2 B1.1,

---

[4]      Mr. Krejci does not assert that Ms. Duggan expressly directed him of the propriety of signing the check, but rather that her presence and silence contributed to his belief at the time that he was acting appropriately.
[5]      A copy of the referenced memorandum is attached at Tab A to Motion of Defendant Stanley Krejci Regarding Calculation of Loss, previously filed with the Court.

[6]      A copy of the letter and check are attached at Tab B to the previously submitted Motion Regarding Loss.

Application Note 3(E)(i), contending the provision does not apply because the "victims knew money was missing from their retirement accounts by November 2001," and that the money in fact was never returned to the "victims." The government, however, misapprehends the Application Note, which, as indicated in <u>United States v. Staples</u>, 410 F.3d 481, 491 (8th Cir. 2005), provides benchmarks for measuring Mr. Krejci's intent. <u>See id.</u> ("Courts do not subtract from the intended loss repayments made by a defendant to his victim after the detection of the offense, *as such payments, given their timing, likely do not indicate anything about the defendant's culpability*....For the opposite reason, though, courts do subtract payments that were made before the offense was discovered.") (emphasis added). In this case, Mr. Krejci did everything in his power to return the entire $20,500 to the Plan a year before he became aware of any investigation, which does speak to his intent. Under these circumstances, the amount of loss for Guidelines purposes is appropriately reduced by the amount Mr. Krejci returned.

In addition, the $20,000 withdrawn on May 31, 2000, after Mr. Krejci had resigned from his position at the Company, should not be included in the loss calculation. It is undisputed that, at the relevant time, Mr. Krejci was not employed by Interface; he was present in the office to collect his belongings and leave; and that Mr. Marumoto asked Mr. Krejci to sign off on the check for a loan drawn from the Plan account because he had had not yet designated a successor Plan signatory, which no one had any reason to believe would not take place. In addition, Mr. Krejci had no independent access to information concerning the Plan at that date or of its then current level of funding. Ms. Duggan, Interface's outside accountant, corroborated the amount for the check.

In opposition, the government errs in contending that this check should be included in the loss because Mr. Krejci "had a continuing obligation to check on the status of the funds" and

"was not entitled to rely upon the statement of Ms. Duggan" because she was Interface's accountant, not the Plan's accountant. Opposition at 4. The suggestion that Mr. Krejci knew or should have reasonably believed that the independent auditor of this small, five person company did not have access to the related-party pension plan's books and records is, at best, unrealistic. The government, moreover, offers no authority for the proposition that a nominal plan fiduciary in the circumstances present here acts in breach of his duties by reliance on information from those who, unlike him, are positioned to know the relevant facts. In any event, the government's leap from its questionable foundation to an inference that Mr. Krejci acted with the necessary criminal intent with respect to the May 31, 2000 is speculative, and is not a basis for including the amount of the check in the calculation of loss for sentencing purposes.

## II.    Application of Section 3553(a) Warrants a Sentence of Probation.

Under both post-<u>Booker</u> sentencing, and the prior mandatory United States Sentencing Guidelines regime, a downward departure to a probationary sentence is warranted here. In the wake of <u>Booker</u>, and in any event, consideration of the Guidelines along with the overarching sentencing concerns set forth in 18 U.S.C. § 3553(a) demonstrate the sufficiency and appropriateness of a probationary sentence.

### A.    Guidelines Adjustments.

Mr. Krejci requests a downward departure on the guidelines calculation pursuant to §§ 2B1.1, 5K2.20, 5K2.11 and 5K2.0.

1.    The Offense Level Determined by § 2B1.1
      <u>Substantially Overstates the Seriousness of the Offense</u>.

Even if the Court agrees with Mr. Krejci that the amount of "loss" under § 2B1.1 should not exceed $60,039.87, such amount would still substantially overstate the seriousness of the offense. Accordingly, a downward departure is warranted.

Application Note 19(C) to § 2B1.1 states:

> C) <u>Downward Departure Consideration</u>.—There may be cases in
> which the offense level determined under this guideline
> substantially overstates the seriousness of the offense. In such
> cases, a downward departure may be warranted.

In appropriate cases, "where the amount of loss substantially overstates the defendant's conduct
a downward departure may be warranted." <u>United States v. Keller</u>, 2005 U.S. Dist. LEXIS
23848 at *15 (N.D. Texas Oct. 17, 2005).   The courts have identified "four scenarios in which a
loss determination may significantly overstate the severity of the offense" and justify a
downward departure.  <u>United States v. McBride</u>, 362 F.3d 360, 375 (6th Cir. 2004).  Of
particular relevance here, a defendant's role in the offense may warrant departure.  As elucidated
by one court, this analysis embraces a multiplicity of factors:

> The defendant may have had a limited or inferior role in the fraud
> that bore little relationship to the amount of the loss; he may have
> had little or no knowledge of the amount being taken, such that it
> would be unfair to attribute the entire amount of loss to him; his
> intent in involving himself in the scheme may have been
> significantly different than of the usual fraud defendant, e.g. he
> may have entered the scheme with honest intentions or with the
> intent to make good on his obligations; his fraudulent
> representation may have been of limited materiality, as where he
> could have obtained a loan by truthful means but at a higher
> interest rate; or the defendant's fraud may have been for little or no
> gain, especially in comparison to the size of the loss.

<u>Keller</u>, at *16-17 (<u>quoting</u> <u>United States v. Forchette</u>, 220 F. Supp. 2d 914, 925 (E.D. Wis.
2002)).  A downward departure under the "substantial overstatement" factor has also been made
where "a defendant … has made extraordinary efforts to remedy the wrong" -- such as where
"the defendant has made full or nearly full restitution prior to being charged." <u>Id.</u>

In this case, Mr. Krejci's role warrants a downward departure under Note 19(C).  Mr.
Krejci caused the transfer of funds from the Plan to Interface upon agreement with Mr.
Marumoto and in order to keep the Company in business.  Mr. Krejci's intent manifestly was

"different than the usual fraud" or "embezzlement" defendant. Indeed, Mr. Krejci had *lawfully* caused the Plans to loan money to Interface for three years for this purpose. Mr. Krejci had no different motive or intent as he continued to do so after Mr. Marumoto's funds had been depleted. Mr. Krejci, moreover, committed the offense clearly "with honest intentions" *and* "with the intent to make good on his obligations" -- i.e., that the money, loaned to Interface, be returned to the Plan. Indeed, each and every Plan withdrawal was documented by a file memorandum signed by both Mr. Krejci and Mr. Marumoto, with a copy of the relevant check attached. Mr. Krejci's offense, moreover, was "for little or no gain" for himself. See, e.g., Keller at *17-18 (applying downward departure where, among other things, "defendant received no monetary benefit from the scheme (other than, arguably, the benefit of continued employment…)"). In addition to the nature of Mr. Krejci's role in the offense, Mr. Krejci has also made complete restitution. Accordingly, Mr. Krejci submits that downward departure is warranted under § 2B1.1, Application Note 19(C).

    2..    <u>Mr. Krejci Sought to Avoid the Perceived Greater Harm</u>.

In pertinent part, § 5K2.11, <u>Lesser Harms</u>, states:

> Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected.

In this case, in agreement with Mr. Marumoto, and for a period of three years, Mr. Krejci had *lawfully* caused the plans to loan funds to keep Interface from collapse -- a result that, among other things, would have cost Ms. Englander and Ms. Ruggiero, the victims, their jobs. In September 1999, for the *same benign motives,* Mr. Krejci transferred further amounts. His

conduct violated 18 U.S.C. § 664 only when the transfers began to reduce the Plan interests of Ms. Englander and Ms. Ruggiero.  Mr. Krejci failed to adhere to ERISA's mandate to preserve the beneficial interests in fungible dollars.  Nevertheless, it cannot be gainsaid that, *consistent with every report of Mr. Krejci's character*, Mr. Krejci transferred the funds in order to *help others*, the Company and victims included, and avoid what he reasonably perceived as the greater harm of the Company's collapse.  Accordingly, a downward departure is appropriate under § 5K2.11.

   3.    A Downward Departure for Aberrant Behavior is Warranted.

   A downward departure under § 5K2.20, "Aberrant Behavior," is warranted in this case. Subsection (b) of this section states:

> REQUIREMENTS.—The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.

There can be no question here that the offense to which Mr. Krejci has pled guilty was committed without significant planning, was of limited duration, and represented a marked deviation by Mr. Krejci from an otherwise law-abiding life.  Moreover, the offense conduct -- writing checks from the Plan to Interface -- was exactly the same conduct that Mr. Krejci had engaged in lawfully over the three years preceding the offense.  The offense consists of a singular, limited failure to act--i.e., to ascertain the account balances and application of ERISA requirements.  The six occasions in which Mr. Krejci wrote checks that drew on unauthorized funds were not separate or multiple steps or building blocks to the accomplishment of some scheme, but rather components of the single omission that constitutes the offense.  In this regard, application note 2 is instructive.  It states:

> Repetitious or Significant, Planned Behavior.—Repetitious or
> significant, planned behavior does not meet the requirements of
> subsection (b). For example, a fraud scheme generally would not
> meet such requirements because such a scheme *usually involves
> repetitive acts*, rather than a single occurrence or single criminal
> transaction, *and significant planning.*

App. Note 2 (emphasis added). In this case, as noted, there was no "scheme," no "significant

planning," and a single or limited failure to act.

Finally, compelling circumstances exist for the Court to depart under this section.

Subsection 3 states:

> Other Circumstances to Consider.—In determining whether the
> court should depart under this policy statement, the court may
> consider the defendant's (A) mental and emotional conditions; (B)
> employment record; (C) record of prior good works; (D)
> motivation for committing the offense; and (E) efforts to mitigate
> the effects of the offense.

As documented in the PSR and in the overwhelming correspondence submitted on Mr. Krejci's

behalf, Mr. Krejci has an exemplary employment record, and possesses an extraordinary history

of "prior good works." "This is a man whose good works truly outweigh the mistake he has

made." (J. Flint) In addition, Mr. Krejci committed the offense for the same reason he had

engaged in identical and entirely lawful conduct over the preceding three years: to avoid the

failure of The Interface Group and the resulting disruption to all who were part of it, including

the loss of employment by the victims in this case. Accordingly, the Court should grant a

downward departure due to the aberrational nature of the offense.

4.      Mr. Krejci's Extraordinary Community Service and Charitable Works.

Mr. Krejci's acts of community service and charity throughout his life are so

extraordinary as to make a downward departure both reasonable and appropriate under § 5K2.0.

Community service, while a discouraged factor under the Guideline § 5H1.11, may serve

as a basis for a downward departure under § 5K2.0 if present to an exceptional degree. United

States v. Dyce, 91 F.3d 1462, 1470 (D.C. Cir. 1996) ("Before a district court departs on this basis [contributions to society], it must not only find that the defendant is likely to make such contributions, but that he is likely to make them to an extraordinary degree."). See, e.g., United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000) (upholding downward departure provided to a wealthy, former state senator-defendant on the basis of his "generosity with his time as well as his money").

Mr. Krejci's history of community service and charitable participation is truly extraordinary, as the more than 100 letters before the Court uniformly attest, and moves this case out of the Guidelines' heartland, warranting a downward departure.

**B.     The requested sentence is consonant with the goals of § 3553(a)(2).**  Always relevant to sentencing, and now meriting even more attention post-Booker, are the policies and concerns behind the factors enumerated in 18 U.S.C. § 3553(a)(2).  Indeed, even should the Court determine that the bases for adjustment of loss and downward departures addressed above do not, in whole or in part, technically qualify under the Sentencing Guidelines, those facts nevertheless are highly relevant under § 3553(a).  See United States v. Selioutsky, 409 F.3d 114, 117 n.6 (2d Cir. 2005) (Booker invalidated all of § 3553(b)(1), including its limitation on "factors that may be considered in making downward departures"); United States v. Gall, 374 F. Supp. 758, 760 (S.D. Iowa) (considering as evidence under §3553(a)(1) factors that did not meet Guideline definition of "aberrant conduct").  Further, mitigating factors and arguments should be considered "regardless of whether they would have been available under the Guidelines scheme."  United States v. Simpson, 430 F.3d 1177, 1188 (D.C. Cir. 2005).

A probationary sentence is permissible, appropriate and just under the relevant factors of Section 3553(a).[7]

    1.    <u>A Probationary Sentence Properly Accounts for the Nature and Circumstances of the Offense and the History and Characteristics of Mr. Krejci</u>.  As discussed above, the offense consisted of Mr. Krejci's improperly causing unauthorized funds from The Interface Group's Plan to be loaned to the Company.  The offense is serious:  employees and their families rely on retirement accounts as a means of support after they no longer earn an income.  Mr. Krejci's misuse of the victim's retirement accounts violated his duty to protect such assets.  Nevertheless, Mr. Krejci did not act for personal gain.  He committed the offense by engaging in the very same conduct that, for three years preceding the offense, had been entirely lawful.  At all times, he had caused the money to be used to maintain the Company as a going concern and, as a result, keep alive the victims' jobs.  The specifics of the offense itself substantially mitigate the seriousness of the offense.

Moreover, as earnestly described by a great number of his fellow citizens who know him best, Mr. Krejci's history and characteristics strongly militate for a probationary sentence.

    2.    <u>A Probationary Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law and Is a Just Punishment.</u>  The requested sentence of a probationary term, coupled with restitution and a substantial amount of community service, adequately reflects the seriousness of Mr. Krejci's offense.  The act of a man, with an otherwise unblemished professional and personal life and no criminal record whatsoever, who behaved out of character and violated the law, does not in these circumstances call for the severe and life-altering sanction

---

[7]    A probationary sentence is available here, as a violation of 18 U.S.C. § 664 is a class D felony.  18 U.S.C. § 3559(a)(4); 18 U.S.C. §3561(a)(1).

of incarceration. Incarceration here would result only in further trauma and crisis, both personally and economically, not only for Mr. Krejci and his family, but for the spirit of an entire community.

3.    A Probationary Sentence Is Adequate and Appropriate Deterrence. Mr. Krejci does not pose a threat of recidivism. Specific deterrence is not an issue with respect to an act constituting such a marked deviation from a law-abiding person such as Mr. Krejci, in such unique circumstances. Having by his crime shamed himself in the eyes of the community, having had his and his family's lives thrown into disarray, Mr. Krejci has been deterred, and the professional and collateral consequences of his guilty plea provide further punishment still.

As for general deterrence, a case such as this, centering on conduct which is a departure from an otherwise law-abiding life, is not an appropriate vehicle for its advancement. Even if it were, the proposed probationary sentence comports with the goals of general deterrence, illustrating that a violation of the law by an otherwise law-abiding and productive citizen – especially for such a person – results in serious, damaging and irreparable consequences.

Finally, the consequences of Mr. Krejci's predicament resulting from his offense have already served the interests of deterrence by the stark reminder to Mr. Krejci's community that no one is above the law and that all must be mindful that, as dark as it is to contemplate, even the best have it within themselves to cross the line. As one of Mr. Krejci's acquaintances in a business organization relates: "When I first began to read an article in The Washington Post about the legal problems of 'Stanley Krejci,' I thought to myself that it could not be the same 'Stan' that I know... A few days later, when talking to a colleague, I found out that the article was indeed about the "Stan" that I know and I was truly astonished....All of us who know Stan professionally realize the seriousness of his situation. It has been a reminder to us all that we

must remain diligent and lawful, and not compromise our ethics in our business pursuits." (W. Jones)

4.    <u>The Need to Protect the Public From Future Crimes Is Not Implicated</u>. This factor simply is inapplicable here: there is no cause to be concerned that Mr. Krejci will be recidivist or otherwise poses any potential harm to the community.

5.    <u>Care, Treatment or Training of Mr. Krejci Is Best Served By A Probationary Sentence</u>. As noted in the PSR, Mr. Krejci, who undergoes treatment for high blood pressure and cholesterol, recently was diagnosed with aortic stenosis. PSR ¶¶ 41, 42. This condition is being closely monitored by his health care providers, and if it worsens, may require open heart surgery. Mr. Krejci would be best served by having the necessary monitoring continue under his health care providers, and, should surgery prove necessary, by their provision of same.

In addition to aortic stenosis, Mr. Krejci also suffers from sleep apnea, a condition which if untreated contributes to heart disease, and for which he is currently undergoing treatment at the George Washington University Hospital Sleep Clinic. PSR ¶ 42. Mr. Krejci's health interests are best served by his continuing treatment with these sleep disorder specialists, the significance of which is only increased in view of his other cardiovascular risk factors noted above.

6.    <u>Mr. Krejci Has Made Full Restitution to the Victims</u>. As noted, Mr. Krejci has made full restitution to the victims.

## IV.    SENTENCING RECOMMENDATION AND REQUESTED FINDINGS.

A.    <u>**A Sentence of Supervised Probation Is Appropriate**</u>. Mr. Krejci respectfully submits that the appropriate sentence is a term of supervised probation. As discussed above, upon adjustment of the amount of loss to $60,039.87, Mr. Krejci's offense level is 11, derived as follows:

23

| | |
|---|---|
| Base offense level: | 6 |
| Specific offense characteristic: | 6 |
| Abuse of Position of Trust: | 2 |
| Acceptance of responsibility: | - 3 |
| Interim offense level: | 11 |

A reduction of 4 or more points, based on one or more of the bases for downward departure identified, brings the calculation of total offense level within Zone A and subject to a sentence range of 0 to 6 months:

| | |
|---|---|
| Interim offense level: | 11 |
| Loss Overstates Seriousness: | - 4 |
| Aberrant conduct: | - 4 |
| Lesser Harms: | - 4 |
| Community Service: | - 4 |
| Total offense level: | 0 |

Accordingly, pursuant to U.S.S.G. § 5B1.1(a)(1), a sentence of probation is authorized.

In the alternative, should the Court disagree with Mr. Krejci's analysis concerning the amount of loss, and/or grant a departure at a level less than that requested or deny it altogether, resulting in his total offense level falling within Zone B or greater, then Mr. Krejci respectfully submits that a term of probation is "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of " § 3553(a). 18 U.S.C. § 3553(a)(2).

**B.**    **Restitution and Fine.**  Krejci's already has made full and complete restitution in the amount of $100,539.87.

Mr. Krejci respectfully submits that the fine imposed in these circumstances, where the offense constitutes such a marked departure from a law-abiding life, be at the low end.  For the reasons stated above, a fine at the low end of the applicable range as determined by the Court comports with the policies and goals of U.S.S.G. § 5E1.2(d).  Alternatively, Krejci respectfully

24

submits that the fine be the cost of two years of supervised probation:  two years of supervised

probation, at the monthly cost of $292.21, for a total of $7,013.04.  Cf. United States v. Toback,

No. 01 CR. 410(RWS), 2005 WL 992004, *4 (S.D.N.Y. April 14, 2005) (discussing costs of

punishment in imposing fine under U.S.S.G. § 5E1.2(d)(7) and noting monthly cost of

supervision per Administrative Office of the United States Courts).

      C.    **Community Service.**  As part of any probationary, non-custodial sentence, Mr.

Krejci is prepared to accept a requirement of community service in the Washington, D.C.

metropolitan area, for such time as the Court sees fit.

## CONCLUSION

Circumstances such as those here are precisely why departures exist and remain essential to the dispensation of justice at sentencing: a good man's aberrant, misguided act arising more from lack of care and poor judgment than any criminal intent is not a typical case.  Mr. Krejci fully accepts responsibility for his offense, and is deeply sorry for and ashamed of his actions. His offense constituted a dramatic and unprecedented deviation from his law-abiding life, and should not eclipse all the good he has done and is doing, and prevent him from continuing with his civic minded charitable efforts.  For the reasons stated herein, we respectfully request that the Court sentence Mr. Stanley Krejci to probation.

Respectfully Submitted,

STANLEY KREJCI,

By his attorneys,


_____/s/_____
Sanford M. Saunders, Jr.
Greenberg Traurig LLP
800 Connecticut Avenue, NW
Washington, DC 20006
(202) 331-3130
saunderss@gtlaw.com

A. John Pappalardo
Greenberg Traurig LLP
One International Place
Boston, MA 02110
(617) 310-6072
pappalardoj@gtlaw.com

#182531

26