UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No.: 05-286 (EGS) |
| | : | |
| v. | : | |
| | : | |
| **STANLEY KREJCI,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its memorandum in aid of sentencing.

### Introduction

The government contests the defendant's request for a sentence of probation. Although this memorandum will highlight unfavorable facts about the defendant's conduct while he served as Trustee of the pension funds for the two victims in this case, the government does not seek to increase the defendant's sentence. The government submits that the defendant's sentence should be 12 months and one day, a sentence at the bottom of the applicable guideline range when good time credits are taken into account.[1]

### The defendant's actual treatment of the victims

In his quest for a sentence of probation, the defendant invokes a variation of the defense of blaming the victims. The defendant contends that the victims should be grateful to him because he preserved their jobs when he took their money from their pensions without their permission while acting as their Trustee. The defendant indicates that he simply failed to focus on the pension funds while trying to save the company and thus, the jobs of the victims.

---

[1] A defendant sentenced to 12 months is not eligible for good time credits.

During the eight years prior to becoming President and Chief Operating Officer at Interface, the defendant served as a Vice President of Finance, a Chief Financial Officer, and a Treasurer at another company. The defendant's experience as a professional financier eliminates any question that he knew the importance of his fiduciary duties as Trustee of pension funds at Interface. But the defendant's conduct toward the victims did not involve mere neglect of the victims' accounts. The defendant refused to communicate with the victims about the status of their pension funds even though he was asked about it more than once. In February 1997, a victim, Hope Johnson, was forced to send a written request to the defendant about the status of her pension plan. The memo reveals not only that the defendant had refused to give her an accounting of her pension plan since December 1995, but also that the defendant had not rolled over her pension as she requested. See Exhibit 1. In July 1998, Ms. Johnson was forced to send another written request to the defendant seeking an accounting of her pension fund. See Exhibit 2. The defendant disregarded these memos and failed to perform his fiduciary duty to communicate with the victims about the amount of their accounts. It was not until after the defendant left the company that the victims learned that the defendant had taken their pension funds.

As a further proof of his disregard for the victims, the defendant allowed the ERISA insurance bond on the pension plans to lapse. Thus, the defendant prevented the victims from recovering an insurance payment to compensate them for the fact that the defendant had taken their money.

### The defendant's actual management of the pension plans

The defendant makes much of the fact that a company accountant, Ms. Duggan, was present when the defendant wrote the final check against the pension plans for $20,000 in May 2000. The defendant indicates that he thought it was reasonable to take the money because she said it was needed for the operations of the company. In fact, the defendant knew differently.

It is telling that the defendant does not mention Gorrelick and Tevy at any point in his memorandum. The firm of Gorrelick and Tevy was the third party administrator for the pension fund at Interface. The whole point of using the third party administrator instead of the company accountant was to keep the pension funds separate. As the Trustee for the pension funds, the defendant had at least annual contact with Gorrelick and Tevy in order to prepare tax returns for the pension funds. Although the defendant was not always prompt in preparing the returns, he worked with Gorrelick and Tevy, not with Ms. Duggan, to prepare the returns. In fact, as Exhibit 3 demonstrates, the defendant was working with Gorrelick and Tevy to meet an October 15, 1999, tax filing deadline for the pension funds. This is significant because the defendant wrote the first check which resulted in a loss of victims' money on September 30, 1999. The defendant's next check, which took solely victim money, was written on October 14, 1999, in the amount of $15,000. It would have been easy for the defendant to add a few minutes of conversation with Gorrelick and Tevy before he wrote the check in order to determine the values of the pension accounts for which he was preparing a tax return due the next day. Similarly, the defendant wrote two checks, each for $10,000 on November 5, 1999, which was less than three weeks after the tax return was filed. The evidence shows that the defendant knew who to ask about the value of the plans. He should have contacted Gorrelick and Tevy, but he chose not to do so.

Although the defendant considers this a lone, aberrational offense, the facts do not support his claim. The defendant did not write just one check which overdue victims' funds by, let's say, $10,000. To the contrary, the defendant wrote nine checks spread over any an eight-month period which took more than $100,000 from the victims. Before writing each of these checks, the defendant merely had to consult with the third party administrator about the amount of funds in Mr. Marumoto's account in order to learn that all of Mr. Marumoto's money was gone. The defendant did not do so. Instead, the defendant wrote the checks like he was spending other people's money – which he was.

There is something to the defendant's argument that he was not as bad as he could have been because the money did not go directly into his pocket. However, the defendant was not an altruist. The defendant began transferring Mr. Marumoto's pension money into Interface in July 1996. Over the next three years, the defendant infused nearly $700,000 of Mr. Marumoto's funds into the company. During those three years, the defendant benefitted from the pension money because he was officer of the company who was drawing a full salary. In addition, the defendant was a stockholder. While it is true that Mr. Marumoto consented to these transfers, the defendant did not exhibit the kind of a fiduciary relationship with Mr. Marumoto which might have been expected. The defendant did not warn Mr. Marumoto about his dwindling pension funds. Neither did the defendant seek to defray Mr. Marumoto's losses by, for instance, investing the defendant's own pension funds into Interface. Instead, the defendant kept writing checks. It was not until 2000 that the defendant agreed that both he and Mr. Marumoto would stop receiving a salary. By that time, the defendant had already taken more than $60,000 from the victims.

<u>The loss amount in the PSR is correct</u>.

The government will not restate all its arguments from its prior pleading that the PSR correctly determined the amount of loss to be $100,539.87. However, the defendant persists in his position that the amount of loss should be reduced because he attempted to return money before the investigation into his conduct began. Although it is true that the amount of loss should be reduced by amounts returned "to the victim before the offense was detected," the Commentary Note 3(E)(i) to § 2B1.1 states:

> The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim <u>or</u> government agency; or (II) the time the defendant knew or should have known that the offense was detected or about to be detected by a victim or government agency. (Emphasis added.)

Because the defendant made no attempt to repay money he had taken until <u>after</u> the victims knew of their loss, the money which the defendant attempted to return in November 2000 does not qualify for reduction of the loss amount.[2]

<u>A sentence within the guideline range is appropriate</u>.

The defendant requests probation because public embarrassment is sufficient punishment, because his crime was an aberration, and because incarceration would prevent him from performing valuable community service. Prior to the enactment of the Federal Sentencing Guidelines, judges treated defendants making such arguments with unwarranted disparity. Some judges accepted the argument that it was wasteful to incarcerate white collar defendants because their loss of job and

---

[2] Moreover, as the government explained in its earlier pleading, any potential credit must be limited to the defendant's share, that is, $10,250. Government's Opposition Regarding Calculation of Loss, p. 3, fn. 2.

professional status was punishment enough. Other judges rejected such arguments and sentenced white collar defendants to incarceration.

The Guidelines reflect the new consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute the defendant's first offense. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the goals of the legislation was to correct what Congress saw as a significant problem in the criminal justice system: the fact that "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984) at 3260. As Justice Breyer, one of the Sentencing Commission's original members, has explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988). This approach provides just punishment for the considerable harm white-collar crime causes society. Today, for instance, pension scandals plague the country's retirement system.

Although the defendant's professional reputation, fund-raising activities, and stable family life are to his credit, it is not true that the defendant is entitled to a "get out of jail free card" for such reasons. The guideline calculations applicable in this case were crafted by a Commission of experts who have been informed by thousands of sentences in prior cases. The kind of extraordinary conduct which would justify a lower sentence is not present in this case. For instance, it truly would have been extraordinary if a large portion of the defendant's own pension money had been invested into saving Interface. Instead, the defendant assisted Mr. Marumoto is plowing his entire pension of $700,000 into the company. While that occurred, the defendant remained an officer of the company drawing a salary. When Mr. Marumoto's money was gone, the defendant he kept writing checks until more than $100,000 belonging to others had been taken without their permission.[6/]

The defendant's decision to plead guilty deserves credit, but there was nothing extraordinary about the speed with which he agreed to do so. Neither was there anything extraordinary about the payment of restitution in this case. The defendant knew the pension money had been taken in 2000, yet the defendant did not make restitution until just before he pleaded guilty in 2005.

Many of those vouching for the defendant's character wrote that they do not know the man who committed the crime. The government submits that is true – they do not. Their bias for the defendant does not change what the defendant did. This is a classic case in which a defendant who knew better used pension funds over which he was the Trustee to fund the operations of a company without obtaining the permission of the victims. The defendant should be punished accordingly. Nothing more, nothing less.

---

[6/] As the defendant noted at p. 12, fn. 3, one victim gave her consent to have $5,000 of her pension funds used to pay Interface's bills in 2002. That happened only once. The payment hd the victim's consent. The money has been repaid with interest by Mr. Marumoto.

As was stated above, the government seeks only the minimum period of incarceration under the applicable guideline range. If a sentence of 12 months and one day is imposed, good time credits will allow the defendant to be returned to his family and friends in less than one year. He then can resume his professional and philanthropic activities.

Respectfully submitted,

KENNETH L. WAINSTEIN
D.C. BAR NO. 451058
UNITED STATES ATTORNEY

_____
THOMAS E. ZENO
D.C. Bar No. 348623
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W.
Washington, D.C. 20530
202-514-6957

**CERTIFICATE OF SERVICE**

I HEREBY certify that a copy of the foregoing Government's Motion was served via electronic filing on this 13th day of February 2006 upon:

A. John Pappalardo, Esquire
Sanford M. Saunders, Jr., Esquire
Greenberg Traurig LLP
800 Connecticut Avenue, N.W.
Suite 500
Washington, D.C. 20006

_____
THOMAS E. ZENO
Assistant United States Attorney